Good morning. May it please the court, counsel. My name is Michelle Hurley. I'm here today on behalf of the appellants, Mark Merfeld, Deborah Merfeld, and Merfeld Transport. We're here today asking the court to reverse the district court's ruling on summary judgment and remand this case to trial. We are making this request based on four premise. First, material facts exist with respect to the issue of whether or not Dometic Corporation was the manufacturer of the subject refrigerator, specifically with respect to the admissions that were made by Dometic with respect to that. Second, the apparent manufacturer doctrine has not been abrogated by Iowa's innocent seller statute. Third, Iowa's innocent seller statute does not require a causal connection between the design input and the specific part that failed. And finally, if a causal connection is found to be required, that would be a jury question. I would like to start with the design argument first, specifically with request to the court's holding that there needs to be a causal connection between Dometic's design input and the specific part that failed, namely, according to the court, the boiler tube. Let me ask you a question that's not addressed in the briefs, but seems to me leaps out from the wording of the statute. 613.181 says a person who is not the designer is eligible for immunity. What is, in your view, what is the, we have to give meaning, substantive meaning to everything in a statute. What's the meaning of the? Well, certainly, Your Honor, the designer and many different products can be more than one entity. There can be more than one entity. Wait, wait, that's not the plain meaning of the. Where do you get that? Well, I wouldn't assume, Your Honor, that the word the in this circumstance means one. I don't think that those two could be supplanted. If you are considered the designer, another person may also be considered the designer. I don't well, that that it seems to me if you're going to go there. That cries out for them for a nexus requirement. If you're going if you're going to take the position that the. Is not going to be given its plain and ordinary meaning, which means if there's more than 1 designer. The immunity statute. You know, your subject, you're in it. Particularly for a retailer. And a retailer, let's take private label products. A retailer constantly participates in what's it going to look like? Certainly, Your Honor. If you're going to if you're going to, if you're going to draft an immunity for retailers. But you want to make an exception for the for a retailer who is the designer. It seems to me that does not that does not accept the participatory. Retailer who provides give specs for what the product's going to look like or how it's going to function. Well, Your Honor, I think that it goes much further than that. And the courts have actually addressed that issue of what what constitutes the designer and what the courts have. In the Stoffel case, as well as the Allianz case. Both of those courts addressed the issue of, I'm sorry, of the designer and what constitutes the designer. And they may not have called out the word the in the way that Your Honor is calling out the word the. But they certainly discussed what constitutes a designer of a product. And what they were referencing was that the person that that's in question, the entity that is in question. That's been sued, has to have some responsibility for the design. Not the complete responsibility. Not the overarching responsibility. Not the one who says at the end of the day, this is absolutely that one thing. They said some responsibility for the design. That is what the cases that are out there that exist now state with respect to this requirement. They don't single it out. They don't say that it that it can't be more than one person. Because they contemplate that in both of the cases. You have two people that are involved in the design. And the question is whether or not one or the other have some responsibility. And in one of those cases, the court said absolutely not. They didn't have any design input. Those cases might be wrong. Certainly, Your Honor. Certainly not controlling. I can't even see Stofel in your list of authorities. Stofel, Your Honor. Stofel. Stofel. Yes, Stofel. Those are not controlling. Well, Your Honor, those are the only cases that we have out there currently with respect to design. Neither one's in appellate court, right? That is correct. There's been no state court or appellate court that has undertaken this particular statute with reference to what constitutes a designer. And so this is the only law that we have that's out there. And the court in this particular case tried to look at the Kolarik case, which is one of the only two Iowa cases that we have even involving this statute. But unfortunately, that case involved an assembler and not a designer. But what was interesting about the court's reliance upon Kolarik, besides the fact that it was an assembler case rather than a designer case, is that the court used it as a basis for adding this extra requirement, this causal connection requirement. And in the causal connection requirement, it is required for an assembler. It's right there in the statute. The statute specifically calls out assemblers rather than designers as requiring to have this causal connection. It's in subdivision B of that statute. And moreover, so in addition to adding this extra requirement for designer, which clearly the legislature could have done and chose only to do for assembler, the court in Kolarik wasn't even focused on that part of the statute. What they were referring to is just this initial threshold question of whether or not it was an assembler of the product that injured the plaintiff, which is a question that you have in any products liability case. Whatever product injured the plaintiff, you need to be talking about the manufacturer of that product, the assembler of that product, or the designer of that product. Your argument is that every time a retailer participates in any way, in any aspect of what could be interpreted as the design of the product, immunity is gone. Because you're saying there doesn't have to be a relationship between the retailer's participation in design and the ultimate injury. Yes, Your Honor. There's no requirement within the statute. Except for the designer. Except for the designer, Your Honor, which assumes that there is only one designer of a product, which just simply doesn't comport with. It also says the assembler. But then in B it recognizes that assembly can be done at home or abroad. There are aspects of assembly that occur all the way down the food chain, so to speak, ending with the retailer. Your Honor. So they put in a relationship. With all due respect, Your Honor, I don't believe that that's what Subdivision 2 is referencing. What Subdivision 2 is referencing is whether or not the assembly of the product was related to the injury of the party. It's not a matter of whether or not there was more than one assembly done of the product. It's whether or not that assembly actually caused some injury. And that's what Subdivision 2 is referencing. Correct. The retailer's assembly having no causal relationship. To the injury. So the retailer may do the final assembly. Right. The Italians may have done the assembling and pitting of the olives, but the retailer ultimately or the wholesaler in the U.S. puts them in jars and so forth. Yes. What the court was saying is that the product in that case was the olives, and they didn't assemble the olives. And that was what caused the injury to the person in that case. So they're talking about what is the product. Is the product the jar of olives, which obviously the assembler in the case had some role in that, versus is the product the olive? And that's the problem with relying upon calericas, because they weren't even talking about Subdivision 2. That wasn't a part of their analysis. Under your argument, if you were a person who manufactured refrigerators and you just say, okay, we'll sell you the refrigerators to put into your RV, right, and the guy who owns the RV says, oh, by the way, all of our refrigerators have to be right hinged rather than left hinged, because if they're hinged the other way, they won't open in the space where we've got it designed, that those people are now in all the way. They're just somebody gets to litigate through this whole thing because they said, by the way, got to be hinged on this side. Right, Your Honor, and I do agree that it does make a difference in terms of the level of responsibility that they have. What we disagree with is this specific causal connection requirement that the court added to the statute. That's really what we're taking issue with. That's the part of it that we're taking issue with. We're not taking issue with looking at the level of involvement that they had in general with the product, which we find to be very significant in this particular case. If you look at what the Dometics Director of Engineering stated, I don't think it's added to the statute. It's the only reasonable interpretation of the word the, other than to say, unless the retailer is a sole designer, immunity applies. Well, Your Honor, I think that's clearly what the statute was. I mean, that's consistent with the obvious purpose of the statute to me. Well, Your Honor, that would not be consistent with some of the other cases interpretation of this, which would say. You mean the district court cases you've cited? Yes, Your Honor. Yes, Your Honor. We've got an appellate court case with an incomparable statute. No, Your Honor. No, Your Honor. But the involvement of Dometic here was significant. And it did go to the heart of the safety of the, of the product itself. There was heavy involvement on them in terms of the design. It wasn't just saying we like this color better than the other color, make it that color. As I understand the facts of record. In the summary judgment record. If the, If the Swedes had an aspect that came in and sent a prototype to this country and McCatrick. McConnell. McConnell looks at it as a, as an expert on North American safety standards and tells the Swedes. This, this is, as this performs, it will not be certified for sale in this country. And now the Swedes go back and, and I don't know if it's redesigned, modify what or improve its performance. That's not designing. No, he can make a specific demand that they change a part of it to comply with safety standards. In addition, Your Honor, you have to remember. Who testified to that? McConnell testified to that. He could demand. He could. The Swedes had no choice. Well, Your Honor, it wouldn't be, it wouldn't be sold in the U S if it didn't comply. He, he ensured that it complied with the standards. He wasn't the certifier. He's telling them if you, in his, in his, from his perspective and with his experience, if they don't change this, it won't be certified. Right. Your Honor. And, and he had the ability to say to them, you need to make these changes to it. And if they didn't, then it wouldn't be sold. And it wouldn't be sold in the U S. In addition to that, Your Honor. I don't think, I don't think, I think you're seriously overstated. Your Honor. In addition to that, they also were heavily involved in this recall in that they designed entirely the recall fix. I mean, of course they were under, under American law. They, the, the U S retailer would not be allowed to not take responsibility for Amanda, for a recall. No, Your Honor. I'm not talking about taking responsibility and instituting. No, actually, Your Honor. Actually, Your Honor. I'm not actually referencing that. What I'm referencing is they actually designed the recall fix that went on the refrigerators. I'm not talking about them instituting the recall. You're correct. That is their obligation as the retailer to undertake that. I'm saying the actual design of not to our knowledge. No, Your Honor. All right. I want to just talk briefly about why is the apparent manufacturer doctrine not abrogated by the adoption of the standard? It's a simple fact of cannons of construction. There has to be something within that statute that indicates they intended to abrogate well existing common law. And there's just not anything in the statute. And you can see that when you look at many of the other cases where they've undertaken this, they followed those same constructions of the statute and said, okay, is there something there? And what we see in many of the other cases, if not all of the other cases, is there's a clear indication in the definition of manufacturer that they intended to move away from an apparent manufacturer doctrine. And that just simply doesn't exist in this particular case. Even if it does still exist, don't you need reliance? Yes, absolutely, Your Honor. We do need reliance. Is it your view that it is an actual reliance or an objective standard? It hasn't been addressed specifically by the Iowa courts, but the majority of the courts have held that it is an objective test of reliance, which would easily be met in this case, given all of the statements that have been made by Dometic. What is that evidence? Even if it is an objective standard, what is the evidence in the record that would support that finding? Dometic has told the public at large that they are, Dometic Corporation has told the public at large that they are, in fact, the manufacturer of these refrigerators. And I think that the public should be able to rely upon their public statements. Are you talking about the recall letters? Yes. Yes, Your Honor. Are you talking about anything other than the recall letters? Is there anything else? In terms of, to the public, the public at large, I'm not aware of any other. Or to the, to the, to those who buy, to those who buy these, it's an RV, right? That had this refrigerator. Other than the fact that it says Dometic on it. No, Your Honor. Right. So there's no evidence that that's a, that's a, that's something that's important to an RV purchaser, that this is a Dometic refrigerator. Correct. Your Honor. I'd like to reserve my remaining time. Thank you. Is it in the record? Why the manufacturer, actual manufacturer was not sued. Is it in the record? It's somewhere in the record. I don't know if it's district court record, but it's in our materials. If it is in the record, it's a matter of fact that your client sued the actual manufacturer in another case. Yes, Your Honor. So is it in the record? Why, why that was not done here? Well, the Mayor Felds, to be clear, did not, did not sue Dometic in a prior case to Medic AB, but it was there was a, there was a case prior to this where Dometic AB was sued. Were essentially brought in. Right. Dometic corporation had been sued just as they are now. I don't want you to go outside the record. I asked. No, I'm sorry. Is it in the record? Any explanation of why the actual manufacturer was not sued, which is significant to the immunity. Your Honor. I am. I am uncertain as to whether or not it's in the record or not. The reason why they were not sued in this particular case, other than the fact that they, we don't have jurisdiction over them, but I can't, I honestly do not recall whether or not that somewhere in the record or not. What do you mean? We don't have jurisdiction. The state, the United States does not have jurisdiction over Dometic AB. Dometic AB. Why is that? If they manufacture a product that they ship into the United States that causes injury, why doesn't that fit into a long arm jurisdiction generally? Well, your Honor, I would argue that it does subject them, but a district court in the state of Iowa had a differing opinion and they felt that they did not have significant context with the U.S. Was that Powell? That was the, the other Dometic case that cited to in the record, the Bowman case. The Bowman case. Yeah. All right. Thank you. May please the court. Counsel, uh, I want to jump right into that last issue. The Bowman court never said they didn't have jurisdiction over Dometic AB. Uh, this isn't in the record, but it is in pleadings, uh, available that the court. The pleadings in this case? No, in the Bowman case. In the state court case? In, in a federal district court case in, for the Southern district of Iowa. But the allegation that they don't have jurisdiction over Dometic AB was not made in that case. It was, the finding was that the, uh, jurisdiction allegations in the pleadings were insufficient to establish jurisdiction. Uh, not that they couldn't get jurisdiction over Dometic AB. Uh, the Clark case and, and counsel's representation regarding the Clark case is, is incorrect. The Clark case was not dealing with whether or not the olives were the product. And it was not dealing with, uh, part two or subpart B the holding in Clark was unless the assembling activities under the very first part of the statute, uh, six 13, uh, 18 one a, unless the assembling activities had something to do with the defect, uh, an assembler was not liable. There was no finding that they weren't the assembler. Um, there was, that's, that's what that case turned on. The district court found there was no reason to make a distinction. Isn't there a distinction though? Isn't there a distinction between, or at least conceptually and how you're able to separate actors and what they do vis-a-vis the product assembly sort of seems to be a defined category of what you're doing with it. Design seems a little bit more free flowing and it would be, I'm, I'm wondering how you, what, what standard you'd apply on if the district court applied the correct one to determine, um, whether or not there was a connection between the injury and the design, because you could see that design could, um, play a role in a lot of aspects of the product or play no role at all. Correct. And I think, I think an assembly could do the same thing, but on this record, there's no evidence whatsoever that any design impact input, if you even want to call it that, uh, had any connection to the defect. It was the defect. Was that undisputed? What the source of the, the source of the defect was, uh, the source of the defect in this case is subject to some dispute. And I mean, the expert reports generally believe, I think that there's some issue with the boiler tube and micro cracks or fatigue cracks. Um, but it raises an issue that we don't even know who manufactured this Well, if there's a, if I understood the district court correctly, it was, it was the boiler tube. Is that what you're calling it? And, and didn't the district court say, well, there's no, that's the, that's the part that caused the injury and there's no connection between the design and that boiler part. Well, if there's a dispute as to whether the boiler tube was actually the cause of the injury, is that a proper conclusion for the district court to make at this point? Well, there's no dispute that it would, that it's, there's been no really alternative explanations other than it's the boiler tube. And that's consistent with the recall documents or, uh, it's unknown. Yeah. Isn't, isn't the argument that's been presented as, as I was looking through it, they're really twofold. Uh, one is, is that, um, the most probable cause is the, is the boiler tube. We don't know exactly what happened because it was, uh, destroyed, uh, by the fire, but it was either micro cracks or fatigue cracks. Um, one of those two issues, or it's some other source unknown that, uh, was destroyed, uh, in the course of the, the, uh, cleanup, which, uh, you assert is a spoliation. Correct. And that would never be known if that's, it's unknowable because whatever was going on in that building, they power wash the concrete, they hauled away 20 truckloads, uh, of, uh, debris. And all that was left was, uh, uh, what, uh, what they perceived was the source of the fire with no expertise at all. Uh, and they stuck a tarp over it and then all the other evidence is gone. So you're left with only the evidence you could look at. Correct. That is correct. And, and again, a defect in the boiler tube is consistent with the documents of the recall. Um, so that's obviously one argument that's being made. And, and again, I would submit Mr. Mr. McConnell's input does not make him a designer at all. Uh, he's a, he's a seller. Dometic Corporation is a seller. And, uh, in order to sell these in the United States, uh, they had to meet the Canadian North American safety standards and the Canadian, uh, board tests against those standards. Mr. McConnell isn't writing those standards just as any customer, uh, that's going to sell a product, uh, that's going to be manufactured by someone else says, Hey, I need it to meet these standards. Uh, otherwise I'm not going to be able to sell it. You do this. McConnell's testimony was unequivocal that he's not telling them how to design, uh, the refrigerators. He's saying, here's some standards that it's going to have to meet. Uh, I think if you look at the five pages of the appendix where they cite Mr. McConnell's testimony, all that it establishes is two things that he went over there with a sales team to provide input about customer preferences. And that he told them this has to comply with North American safety standards. How does it, uh, vary? I mean, when I looked at it, you know, there's a lot of things that go on where you set, uh, fourth, a series of, uh, spec for bids. And then you talk about things, uh, that make it, uh, more attractive or marketable. And then you let it out. The only difference here is rather than just letting the whole world bid on it, you've got, uh, a, a company that's, that's in some way or shape captive to you or you're captive to it, you know, but, but in the end, how does that really become designed? I mean, what did they, what did they actually, what do you, what do, what do you think is the, is, and I know I'm asking the wrong person, but what do you think the best argument is, is that, that, that they said something here where, I mean, obviously you're a party to the discussions. What's their big argument about that they designed rather than merely spacked? There's no evidence in this record about anything that they specifically designed. Uh, the, Mr. McConnell didn't talk about any specifics about what he actually did. Now, he gave an example about what's in the safety standards. You can't have a, a more than two cubic foot, uh, opening on the inside. So a little big brother can't put little brother in there as an example. Um, but there's no evidence in this record about anything Mr. McConnell did that contributed to design of any refrigerators, uh, much less the unknown refrigerator in question. Uh, so I don't think we're in the, the, the realm of designer here at all. And even if we were, there's no evidence that any, um, if you want to call it design input that Dometic corporation had contributed in any manner, uh, to the defect. And other than, uh, the choleric, what other support do you have for making that additional requirement of the link? Cleric is, I think the best, um, evidence of it as it's an Iowa Supreme court case and the authority is, um, admittedly somewhat sparse. Uh, I think the Alliance case that they're referencing, um, is a totally different situation. Uh, the Alliance case, the court found that the, uh, purported designer in that case had a say in the material composition of the actual defective part had an entire design engineer group. The undisputed evidence in this record is that Dometic corporation had no design department, anything like that prior to 2009 and that they had to grow one in 2009 when they started manufacturing, um, reviewed the design in considerable detail, gave specific samples that they had created to develop the design with and had the knowledge and expertise to make the full assessment of the design and complete power to request, deny or approve changes to the design. So that case, what you're saying is it's distinguishable because, because not only was it clearly a designer, there was no question that that design was connected to the faulty part. Correct. So there's, you just, there's nothing because Cleric does, does talk about assemblers and I, I understand you're, you're saying either that's directly on point or the best Iowa law we've got on it, but is there any other, other analysis of similar sorts that help us understand what, how Iowa might, might tease out the design part of this, just given that I think design's different than assembly. I don't think there's any Iowa law that's real great on that topic. I do think also the Stoffel case they, they reference when Stoffel is talking about what a designer can do that puts them on the hook. It says a designer may develop an unreasonably dangerous design. An assembler might put it together wrong. A designer might develop an unreasonably dangerous design. I don't think we have that here either. So I don't think either of those two cases, the Iowa district court cases that they're talking about have any bearing on this. And Cleric really is the best view from the Iowa Supreme Court, I think in, in plaintiff's brief and in their reply, they don't provide a rationale why there should be a distinction other than saying assembler's different than designer. But the district court didn't find any reason to hold those differently. And I don't think there is one, especially under these particular facts. I think as the, the Boyce court in Georgia, it's a state appellate court case that you have to be the designer. You can have someone sit on the manufacturing board. It's a Georgia court of appeals case, Boyce. It is. In that case, they had someone sitting on the design board. The seller had someone sitting on the design board, providing lots of input. But the court said, no, unless you're the designer, the actual designer, you're entitled to immunity under the statute. Thank you. Any other court has addressed that? I think we cite a few, we cite a few examples in our brief where there's varying levels of input, a car dealership case out of Texas. But I think Boyce is the one that we relied upon the post. I think the most, Rubin is a case out of Texas. I think that's the right case that talks about providing all kinds of, you know, customer preferences to the manufacturers and things like that. And there's other cases, maybe one or two other cases cited in our brief on that sort of issue that you have to be the designer in order to, I guess, lose the immunity that these statutes are providing. Our brief covers, I think, in some detail, the apparent manufacturer doctrine and why the Iowa statute has abrogated that. And the Iowa Supreme Court and the district courts have resorted to dictionary But I want to address the reliance element of that because there is zero evidence in this record that Dometic Corporation held itself out as a manufacturer to anyone at the time of this purchase. Do you think the reliance is actual reliance or an objective standard? I agree with counsel that that has been treated differently in certain states. I don't think it matters here. I think it's clear that actual reliance seems to be the best way to capture the purpose of the apparent manufacturer doctrine, which is if you're going to induce someone to purchase something based on your skill in manufacturing it, then we're going to use this estoppel theory, which typically, I think, requires actual reliance. And there's clearly no evidence of actual reliance because the Merfelds didn't even know what brand of refrigerator was in there. But even if you're at an objective reliance test, there's no evidence that there was any holding out as the manufacturer to RV manufacturers, such as Gulfstream or whoever. There's no evidence that they held out as the actual manufacturer or the apparent manufacturer to the public. They sent recall notices to people that had already were in possession of the refrigerator, and that's certainly not with the purpose of inducing them to buy as you're disclosing a defect. So as the Illinois court said in Hebel, it's at the time, even if you're using the objective standard for the purchaser, it's at the time of the purchase. And at the time of the purchase, there is zero evidence that Dometic Corporation had made any representations that it was the manufacturer to anyone, the Merfelds, the public, or a reasonable purchaser such as a RV manufacturer. There's also an alternative basis for affirmance, which is the destruction of evidence in this case, which the district court found was completely was prejudicial and prejudicial enough that it would warrant dismissal. But for the finding of intent, I think with litigation imminent, the district courts in the circuit are saying you don't even need intent. But I think under the Stevenson case where Union Pacific destroyed tapes, even without actual knowledge of imminent litigation, that would be sufficient. In this case, where the Stevenson court also took into consideration the type of evidence that was destroyed in weighing whether or not to impose the sanction. Well, it seems to me that if summary judgment was wrongly or prematurely granted on the facts, requiring a remand, the exfoliation issue would be live and well. Because dismissal is not the only remedy for exfoliation. And all the district court has held is, I'm not going to grant the dismissal of the case based on exfoliation evidence. That is true, and the reason they found it was because of the intent, and we would find that that particular holding was an error. The intent requirement may not be a requirement for lesser sanctions, such as precluding evidence of there was some cause other than whatever. There are all kinds of sanctions for exfoliation, and I'm not sure you're well advised to have the, I don't even know if it's a cross appeal, but I don't see reversing the district court only on that ground. Thank you, Your Honor, may I respond just briefly? I'm out of time. I understand there are lots of different sanctions for exfoliation, but if you look at the destruction of evidence in this case, I don't see how any of them would be sufficient to cure that prejudice other than dismissal. Thanks. Thank you. Ms. Hurley, any time? I'll give you a couple minutes for a vote. Thank you, Your Honor. What's important to know, I guess, the takeaway from this, what we would like you to take away with it, is that there are material facts at issue in this case. There are material facts with respect to the design, what the input was, how that input, if it needs to be causally related, related to the alleged defect. They focused solely on the boiler tube. The boiler tube can have a hole in it and not cause a fire. There are a lot of different things that go into play to creating the hole, and there are a lot of things that go into play into producing a fire. That's all outlined in the recall. It's outlined in the deposition transcripts that are attached. That would all be a question of fact for the jury to decide in relating those two things together. Isn't there a question of fact as well on the issue of spoliation? Not to argue too much with Judge Loken here, but it seems to me that the issue of intent is entirely a fact-laden determination. And when somebody hauls away 20 loads of stuff from a site to say that it's failed because there's no showing of intent strikes me as invading. Making a factual determination, frankly, I don't see how it's reasonable at all. In the world in which I live, I can't see how somebody can haul away 40 loads from a place, power wash the thing, and then you're going to say, well, they didn't intend to make the evidence unavailable. Clearly, when you wash away the soot, you're making the soot unavailable, and you don't have to be a rocket scientist or an expert to understand that's a problem, particularly when you've been told there is pending litigation and we're coming in three weeks. Well, there wasn't pending litigation. Oh, no, there was a claim, and they said we'll be here in three weeks. Correct, Your Honor. And that is an important distinction because there is case law out there that says impending litigation is going to be treated differently. Here there's a two-year gap between the litigation and these inspections that were taking place. Well, that's because there was nothing left to inspect and nothing more to say. Well, Your Honor, all due respect, this was a witness fire that occurred in the RV, and it was seen by witnesses in the RV itself and nowhere else. But notwithstanding that, what I think the district court did here and what I think was valuable in what he did is he parsed out who you're talking about. Are you talking about State Farm, the insurance company for the Merrifields? Are you talking about the Merrifields? You have one person doing the action, and you have another person with the knowledge, and you can't conflate the two together and treat this person who's taking the action as the person with the knowledge. Now, you may very well be correct that there's a fact issue with what knowledge they had, although they've been deposed on that, and all of that was in the record. And the court said they didn't have the knowledge. There was no knowledge there. Yes, they are the ones who took these actions, but they are believing that the only evidence relevant is where the fire occurred, which was the RV. And that was what the court really focused on, is that Dometic was really trying to put the two together and impute knowledge of State Farm or State Farm's attorneys, who even at that time were not the Merrifields' attorneys, and trying to put those two things together. Because in order to have intent, you have to have the knowledge that what you're doing is incorrect, what you're doing is against what you should be doing, and that simply wasn't present. Thank you. Thank you, Your Honor. Understandably, it's a complicated case, and it's been thoroughly briefed and argued, and I'll take it under advisement.